**In the Matter of COMBINED CROFTS CORPORATION, Debtor.**

**In Matter of Roger Allen CROFT, Debtor.**

**Bankruptcy Nos. MM11–84–02052, MM11–84–02053.**

United States Bankruptcy Court, W.D. Wisconsin.

Sept. 27, 1985.

Mark Gerdisch, Law Offices of Jeffrey P. White, Chicago, Ill., and Carlton Roffa, Hales Corner, Wis., for debtors.

R.R. Roggensack, Morse & Roggensack, Lancaster, Wis., for PCA.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

This motion to recover expenses of the debtors in possession under 11 U.S.C. § 506(c) was heard on July 10, 1985. The debtors appeared by Attorneys Matthew Gerdisch and Carlton Roffa, and Production Credit Association of Lancaster, Wisconsin, appeared by Attorney R.R. Roggensack.

On October 18, 1984, the debtor Combined Croft Corp. ("CCC") filed a petition under chapter 11. The debtor remained in possession and continued farming operations including the raising and selling of hogs. Losses have continued to mount in the hog raising operation and no viable plan has been filed in the chapter 11 case.

Production Credit Association ("PCA") holds a comprehensive security interest in the debtor's farm equipment, crops and livestock and in proceeds from the sale of collateral. PCA first moved to dismiss the debtor's case or in the alternative to lift the automatic stay and to prohibit CCC from using cash collateral on November 15, 1984. That motion was ultimately withdrawn and PCA and the debtor entered into a "stipulation and order regarding the use of cash collateral" which was approved by the court on January 29, 1985.

That agreement provided that a portion of cash collateral from the sale of hogs was to be used to pay post-petition farm expenses which had accrued as of December 31, 1984. The debtor was also allowed to apply $1,500.00 to the personal living expenses of Roger Croft. The debtor held approximately $38,384.30 in cash collateral on December 31, 1984 of which $23,447.30 was used with PCA's permission for post-petition farm operation expenses and $1,500.00 was used for the debtor's personal expenses. The balance of $13,437.00 was to be paid over to PCA. The debtor's monthly report summary reflects $19,-700.00 in payments to PCA in January of 1985 which presumably included the ordered $13,437.00 payment. The agreed order also substantively combined CCC's case with Roger Croft's personal chapter 11 case. (The two debtors will be referred to hereafter as "the debtors.")

The agreed order further provided that the debtors would submit their bills for January 1985 farming operations to PCA, and that PCA would review such bills by February 15, 1985. PCA agreed to allow the debtors to pay reasonable expenses from the proceeds of January and February 1985 hog sales.

On March 5, 1985, the debtors applied for a sixty-day extension of the exclusive period in which to file a plan which was granted on March 21, 1985. A plan was not forthcoming and on May 30, 1985, PCA again moved for relief from the automatic stay.

On July 8, 1985, the debtors moved the court to allow them to use PCA's cash collateral. Relief from the automatic stay was granted to PCA on consent July 16, 1985. Approximately $21,480.00 of the subject cash collateral now exists; $10,-000.00 is held in escrow by PCA and $11,-480.00 is held by the debtor.

In the stipulation of January 29, 1985, PCA agreed to allow use of cash collateral "to pay reasonable expenses from the proceeds of January and February, 1985 sales of hog livestock." PCA also agreed to allow the debtors to pay their first installment of real estate taxes due on February 28, 1985 from cash collateral proceeds if "adequate proceeds for debtors' operating needs remain after such payment." The stipulation on its face is silent as to payment of expenses incurred in any periods after February 28, 1985, however the language quoted immediately above suggests that the parties may have contemplated that CCC would continue farming operations at least through the end of February 1985.

In their motion to use cash collateral filed July 8, 1985, the debtors state "[i]n the last few months, debtors have liquidated their livestock herd pursuant to an agreement with PCA." This "agreement" does not appear of record so it is not possible to determine what additional expenses in connection with such liquidation were specifically agreed to by PCA. PCA did acknowledge in its motion for relief from stay that the debtor has applied proceeds of hog sales to operational expenses on a more or less continuing basis with PCA's consent.

A review of the debtors' monthly report summaries shows that substantial payments for farm operations and the personal living expenses of Roger Croft have been

made on an ongoing basis from January 1, 1985 through at least May 31, 1985. These payments have been made from cash collateral in the debtors' hands. Thus, the stipulation and order of January 29, 1985 appears to have been more than complied with by PCA. There is no basis in the record upon which to order further payments from cash collateral based on the stipulation, since there is no indication that PCA has not fully complied with the stipulation and order. Thus, if the debtors are to receive any further payments from cash collateral the payments must be demonstrated to fall within section 506(c) which provides that:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

 Ordinarily, expenses of administration must be recovered from the bankruptcy estate, and not from equity belonging to secured creditors. *See In Re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982); *In Re Korupp Associates, Inc.*, 30 B.R. 659, 661 (Bankr.D.Me.1983). The reason for this rule is that a trustee (or debtor in possession) acts for the interest of general creditors and not secured creditors. *See Trim-X*, 695 F.2d at 301. An exception to the general rule was recognized in the pre-Code case law in circumstances where expenses of preservation were incurred primarily for the benefit of secured creditors, or where a secured creditor caused or consented to the charges. *Id.* That exception has been codified as section 506(c). Furthermore, in any proceeding to recover costs under section 506(c) the debtor or trustee bears the burden of proving that the section 506(c) exception is applicable. *Korupp*, 30 B.R. at 661; *see also In Re Hardy*, 39 B.R. 804, 806–807 (Bankr.N.D. Okla.1984); *Dozoryst v. First Financial Savings and Loan Association of Downers Grove*, 21 B.R. 392, 394 (N.D.Ill.1982).

 Any use of cash collateral under section 506(c) must be limited to actual, reasonable and necessary post-petition expenses. *See In Re Hamilton*, 18 B.R. 868, 873 (Bankr.D.Colo.1982). The "reasonableness" of costs sought under section 506(c) is often measured by the amount which the secured creditor would necessarily have expended in foreclosing on the property in his own behalf. 3 *Collier on Bankruptcy* ¶ 506.06 at 506–55 (15th ed. 1985). *See In Re Codesco, Inc.*, 6 C.B.C.2d 395, 399, 18 B.R. 225 (Bankr.S.D.N.Y.1982); *Brookfield Production Credit Ass'n v. Borron*, 36 B.R. 445, 448 (E.D.Mo.1983), *affirmed* 738 F.2d 951 (8th Cir.1984). "Necessary" costs appear to be those that are unavoidably incurred by the trustee or debtor in possession in the preservation or disposal of the secured property. *See Trim-X* 695 F.2d at 299–301. Thus, expenses which are incurred during periods when the collateral could have been abandoned and turned over to the secured creditor are not "necessary expenses" within the meaning of section 506(c). *Id.*

 The final requirement of section 506(c) is that the costs incurred must benefit the holder of the secured claim. For purposes of section 506(c), "benefit" to the secured creditor must be shown in the quantitative sense and not in any qualitative or generalized sense. *Dozoryst*, 21 B.R. at 394; *In Re Hardy*, 39 B.R. 804, 807 (Bankr.N.D.Okla.1984). The debtor must prove that the costs incurred directly benefitted the secured party. Indirect, uncertain, or speculative benefits are not recoverable. *See Brookfield Production Credit Ass'n v. Borron*, 36 B.R. at 448; *In Re Neu-Deli Corp.*, 19 B.R. 175, 176 (Bankr.S.D.Ala.1982).

The costs sought to be recovered under section 506(c) must be expended *primarily* to benefit the secured creditor. Incidental benefits which accrue to the secured claimant are generally not chargeable under section 506(c). *See: Brookfield Production Credit Ass'n v. Borron*, 36 B.R. at 448; *In Re Codesco, Inc.*, 6 C.B.C.2d at 400–401, 18 B.R. 225. Thus, fees arising from an un-

successful reorganization attempt are generally not allowable under section 506(c). 3 *Collier on Bankruptcy* ¶ 506.06 at 506–55 (15th ed. 1985). *See In Re New England Carpet Co.,* 28 B.R. 766 (Bankr.D.Vt.1983).

■ An examination of the record before the court reveals that the debtor has not met his burden of proof on any of the three elements for recovery under section 506(c). The debtor has not shown that the expenses incurred were reasonable because no evidence was introduced which would tend to show that the costs of maintaining and disposing of the hogs over a ten-month period as chosen by the debtor were comparable to the costs and expenses which PCA would have borne if the hogs had been abandoned in October 1984. Neither has the debtor introduced any evidence tending to prove that his chosen method of liquidation resulted in a higher net return on the sale of the hogs than would have resulted if PCA had been allowed to promptly liquidate the hogs in 1984.

The expenses in question have not been proved to be necessary. The debtor was under no obligation to continue hog raising operations in order to protect PCA's interest in the hogs. Rather, operations were continued in order that the debtor could attempt to reorganize, an endeavor that regrettably proved unsuccessful. Under these circumstances the costs attendant upon the debtors' attempt to reorganize may not be charged to the secured party. *See: In Re New England Carpet Co., supra;* 3 *Collier on Bankruptcy* ¶ 506.06, *supra.*

Most importantly, the debtors have failed to prove any benefit to PCA since as noted above they have not introduced any evidence showing that the chosen method of liquidation resulted in a net gain to PCA. In order to make this showing the debtors would have needed to prove that the net yield of their 1985 hog liquidations was greater than the net yield that PCA would have received had it liquidated the hogs at the first available opportunity in 1984. If anything the record suggests that PCA has suffered a net loss since a large quantity of valuable feed crop upon which PCA also held a security interest has been consumed during the unsuccessful reorganization attempt. No evidence has been introduced to show that the value of the liquidated hogs after deduction for all expenses including the value of the feed crop consumed is greater than the value of the hogs when they might first have been sold. Under such circumstances it is impossible to prove any benefit to PCA. *See: In Re New England Carpet Co.,* 28 B.R. at 766; *Dozoryst,* 21 B.R. at 394.

Although some pre-Code cases also allowed recovery in situations where the secured claimant caused or consented to incurred costs there is good reason for not adopting that reasoning in this case. The basis of those decisions was essentially the need for courts to prevent the charging of unnecessary expenses to the estate which the secured party either caused or could reasonably have prevented. *See Trim-X,* 695 F.2d at 301; *In Re Hotel Associates, Inc.,* 6 B.R. 108, 110–114 (Bankr.E.D.Penn. 1980); *see generally* 4B *Collier on Bankruptcy,* ¶ 70.99[6] (14th ed. 1978). In this case, it is undisputed that PCA did not choose or insist upon the method of liquidation which was followed. In *Hotel Associates* the secured party was held liable for costs where it insisted on the appointment of a trustee and upon an investigation of alleged fraud in the debtors' operations. *In Re Hotel Associates, Inc., supra.* This is exactly opposite the situation presented in this case, where it may more fairly be said that the debtor has "caused" the expenses here in question by his commendable but unsuccessful attempt to reorganize.

Similarly there has been no consent by PCA. The pre-Code law was that where a secured creditor consents to a course of conduct pursued by the debtor it may justly be charged with unnecessary extra costs which result. *In Re Hotel Associates, supra; see Trim-X,* 695 F.2d at 301. However, such consent may not be lightly inferred. *In Re Flagstaff Foodservice Corp.,* 739 F.2d 73, 77 (2d Cir.1984); *In Re*

*S & S Industries, Inc.*, 8 C.B.C.2d 947, 950, 30 B.R. 395 (Bankr.E.D.Mich.1983). Mere cooperation with a debtor or acquiescence in an attempted reorganization is an insufficient basis upon which to find "consent" within the meaning of the cases. *In Re Flagstaff Foodservice Corp., supra; S & S Industries*, 8 C.B.C.2d at 951, 30 B.R. 395; *see also In Re New England Carpet Co.*, 28 B.R. at 772. The reason for this rule is that creditor cooperation is a significant factor in successful reorganization, and a contrary rule would compel secured creditors to immediately move to convert or dismiss chapter 11 cases. *S & S Industries*, 8 C.B.C.2d at 951, 30 B.R. 395.

> To compel a secured creditor to take such action would unnecessarily add to litigation in bankruptcy courts, impede the debtor's attempts at rehabilitation, and burden estates and creditors with unnecessary costs.... [It] would also make it difficult, if not impossible, to induce new lenders to finance a chapter 11 operation.

*Id.* Thus, permitting a reorganization plan to continue, and failing to insist upon relief from the automatic stay does not constitute "implied consent" on the part of a secured creditor to pay administrative expenses. *In Re New England Carpet Co.*, 28 B.R. at 772.

Where "consent" does not result from a fully voluntary and self-interested agreement arrived at between the secured party and the debtor it is inequitable to apply a "consent" theory to effect a reimbursement to the debtor. On the other hand where the secured party, knowing that no unencumbered assets exist from which expenses may be recovered, insists on a course of action certain to result in increased costs it may fairly be charged with those costs.

■ The record in the proceeding now before the court reveals little if any evidence that PCA "consented" to any farm operation expenses within the meaning of the cases. The record suggests rather that PCA initially resisted the debtors' reorganization plans and thereafter reluctantly acquiesced in the attempted reorganization. Although PCA has acknowledged that the debtors applied certain of the proceeds of hog sales to farm operation expenses with PCA's "consent," it is clear from the record taken as a whole that these payments were made more with PCA's acquiescence in the abortive reorganization attempt than with its full and voluntary consent. Further, there is no evidence that PCA specifically "consented" to the use by the debtors of the $21,480.00 fund which is the subject of this dispute. Rather PCA is resisting the use of these funds to pay farm operation expenses. Under the cases cited above, consent may not be inferred in such circumstances. *See In Re Flagstaff Foodservice Corp., supra; S & S Industries, supra.*

Upon the foregoing which constitute my findings of fact and conclusions of law in this matter it shall be ordered that the debtors are denied any recovery from the $21,480.00 in cash collateral which is the subject of this contested matter, Production Credit Association of Lancaster shall recover from the debtors' cash collateral in the amount of $11,480.00 plus costs, and Production Credit Association of Lancaster may apply the $10,000.00 of cash collateral held in escrow pursuant to the order of this court, plus any accrued interest on the same, to reduce the indebtedness owing on the obligation of the debtors in this matter.