**In re Byron E. KOTTER, Hazel Kotter and Lloyd K. Kotter, d/b/a Lucky Lane Farms, Debtors.**

**Byron E. KOTTER, Hazel Kotter and Lloyd K. Kotter, d/b/a Lucky Lane Farms, Petitioners**

**v.**

**FIRST STATE BANK OF BEARDSTOWN, Respondent.**

**No. 184–02533.**

United States Bankruptcy Court, C.D. Illinois.

April 8, 1986.

Barry Barash, Galesburg, Ill., for debtors.

Gary T. Rafool, Peoria, Ill., for First State Bank of Beardstown.

## DECISION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

This matter came on to be heard on the debtors' Petition for Reimbursement under Section 506(c) of the Bankruptcy Code.

The only disputed facts are those associated with the issue of whether the respondent, the First State Bank of Beardstown (the "Bank"), consented to the debtors continuing their hog raising operation. The Bank was a secured creditor of the debtors and had filed a state court action to replevin its collateral, which included the debtors' hog herd. On December 21, 1984, the state court entered an order of replevin directing the debtors to turn over the hogs to the Bank. On that same date the debtors filed their petition under Chapter 11 of the Bankruptcy Code. One of the debtors, Lloyd Kotter, testified that after the Chapter 11 was filed, representatives of the Bank visited the farm, and at that time he showed them the diseased condition of the herd, and explained to them how he planned to rebuild the herd, and that the representatives of the Bank agreed to the plan. The Bank admits that its representatives visited the farm but denies that it agreed to the plan. At the time of the Chapter 11 filing, there were 190 hogs in the herd. During an approximate nine month period the herd was continuously recycled and 1350 hogs were sold with the proceeds deposited in a bank account at the Bank. The proceeds were used to buy more hogs, pay expenses for feed, electricity, and diesel fuel, and to pay to the debtors $3800.00 per month for personal expenses. None was used to repay Bank debt.

On July 25, 1985, the Bank filed a motion to remove the stay. The motion was heard on September 13, 1985, and an order removing the stay was entered on September 19, 1985. The Bank received possession of 718 hogs during a period from September 13, 1985, to October 3, 1985. The hogs were sold for $22,903.00. The debtors'

plan of arrangement was confirmed on October 21, 1985.

The debtors filed their Petition for Reimbursement under § 506(c) seeking to charge the Bank with expenses totaling $60,775.53. These alleged expenses relate to all 2,058 hogs which were processed during the nine month period and not just to the 718 hogs which the Bank ultimately received. The debtors argue that the expenses were incurred with the consent of the Bank in order to rebuild the hog herd, and that it was only after there was a change in the officers of the Bank and the Bank obtained a new attorney to represent it in the bankruptcy proceedings that the Bank changed its position and demanded a return of the hogs. The Bank responds that it should not be charged with the expenses because it was entitled to the hogs via the replevin writ, the writ was stayed by the debtors' voluntary Chapter 11 filing, § 554(a) of the Bankruptcy Code required the debtors to abandon burdensome property, and it did not consent to the recycling of the herd and the incurring of these expenses.

Section 506(c) of the Bankruptcy Code provides that a debtor in possession

"may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

In order for the debtors to recover the alleged expenses the debtors must prove that the expenses were (1) reasonable, (2) necessary, and (3) beneficial to the creditor. *In the Matter of Trim-X, Inc.*, 695 F.2d 296, (7th Cir.1982), and *In the Matter of Combined Crofts Corporation*, 54 B.R. 294 (Bkrtcy.1985). A determination of whether the costs and expenses meet the requirements of § 506(c) will depend upon the facts of the particular case. See *3 Collier on Bankruptcy*, § 506.06.

■ Prior to discussing these three factors, the threshold question of whether all the alleged expenses are in fact expenses which are subject to § 506(c) must be addressed. The Legislative History to § 506(c) provides as follows:

"Any time the ... debtor in possession *expends money* to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the ... debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." (Emphasis added) [124 Cong.Rec. H 11,095 (Sept. 28, 1978; S 17,411 (Oct. 6, 1978).]

Some of the expenses for which reimbursement is requested do not involve the expenditures of money. These include the wages for one of the debtors, Lloyd Kotter, the use of the debtors' pasture for manure disposal, and the expense attributed to use of debtors' machinery. Therefore, those items are not expenses recoverable under § 506(c).[1]

■ The first of the three inquiries under § 506(c) is whether the alleged expenses were reasonable. The court in the case of *In the Matter of Trim-X, Inc.*, *supra*, cited by the Bank, does not give any guidance for this inquiry. In the case of *In the Matter of Combined Crofts Corporation*, *supra*, also cited by the Bank, the court indicated that reasonableness is often measured by the amount which the secured creditor would necessarily have expended in foreclosing on the property in its own behalf, and looked for evidence which would show that the costs and expenses of maintaining and disposing of the collateral over a ten month period were comparable to the costs and expenses which the secured creditor would have borne if the collateral had been abandoned, or that the farm debtor's chosen method of liquidation resulted in a higher net return on the sale of the collateral than would have resulted

---

1. Even if they would be considered to be expenses subject to § 506(c), they are not allowable for the additional reasons set forth below.

if the secured creditor had been allowed to promptly liquidate the collateral. In the case before this court, an analysis based on the Bank's possible foreclosure or liquidation costs is not appropriate because the hog operation continued for a nine month period and regardless of whether the Bank agreed to the debtors' plan, it is clear to this Court that at the end of the nine month period, both the debtors and the Bank had benefited from the continued operation. Furthermore, there is evidence from which it can be determined that the Bank received a higher gross return [2] at the end of the period than if it had promptly liquidated the 190 hogs. If the Bank had replevined the hogs, it would have recovered only 190 hogs. Because the debtors continued to recycle the hogs, the number of hogs which the Bank ultimately received was increased by 528 head, to a total of 718, and the gross amount the Bank received from the sale of the hogs increased from what the court estimates by calculation to be $6061.00 to an actual $22,903.00. Accordingly, I find that the debtors' expenses, excluding those which I have previously found not to be recoverable under § 506(c), were reasonable.

■ The next area of inquiry is whether the alleged expenses were necessary. In both *In the Matter of Trim-X, Inc., supra,* and *In the Matter of Combined Crofts Corporation, supra,* the courts looked to determine whether the debtor could have abandoned the property, and if so, allowed expenses from the date of filing the proceeding to the first point in time when the debtor in possession could have abandoned the property. In the case before this court, the debtors could have honored the state court replevin order and surrendered the 190 hogs to the Bank. Rather than doing so, they filed the Chapter 11 proceeding. At that point in time the Bank did not attempt to remove the stay and recover the hogs. The unrefuted testimony of Lloyd Kotter was that the Bank consented to the recycling of the herd. Although the Bank denies it consented, the Bank officer who testified, stated he was not the bank officer responsible for the loan at that point in time and he did not know the Bank's position concerning the recycling of the hog herd until he was given that responsibility. The debtors presented no evidence as to the specifics of any agreement with the Bank regarding which expenses were to be paid or how the proceeds from the operation were to be used. Nor was any evidence presented to prove the Bank caused or consented to any specific expenses. However, the evidence does establish that the proceeds from the operation were in fact used to pay certain farm expenses and provide debtors with funds for personal expenses. From the evidence it would also appear there was a complete lack of contact or communication between the debtors and the Bank between the time of the initial meeting and the time the Bank filed its motion to remove the stay. It is possible that the Bank consented or that the Bank was uncertain as to its rights under the Bankruptcy Code and what procedure it should follow to obtain possession of its hogs and stood passively by while the debtors continued the hog operation. In any event, on July 25, 1985, the Bank filed its motion to remove the stay. At that point in time the debtors knew that the Bank wanted the hogs returned and could have made a determination to abandon the hogs. As the debtors' testimony stands unrefuted, I find that the expenses were necessary from the date of the filing of the proceeding through the date the Bank filed its motion to remove the stay.

■ The final inquiry under § 506(c) involves the benefit of these expenses to the Bank. In the case of *In the Matter of Trim-X., supra,* the court indicated that expenses of preservation which are incurred primarily for the benefit of the secured creditor or where caused or consent-

2. Whether the net return is higher depends on what expenses are charged to the Bank, the issue being decided under § 506(c).

ed to by such secured creditor could be charged to the secured creditor. In the case of *In the Matter of Combined Crofts Corporation, supra,* the court takes a similar position, and goes on to say that the debtor must prove that the costs incurred directly benefited the secured creditor, and that indirect, uncertain, or speculative benefits are not recoverable. Each case depends upon its own facts, and in the case before this Court both the debtors and the Bank benefited from the recycling. The Bank benefited because both the size of the herd and the gross sale proceeds received by the Bank increased. The debtors likewise received a benefit because (1) proceeds from the sale of 1340 hogs were used to pay farm expenses in a substantial amount and personal expenses of the debtors of approximately $29,700.00, without any proceeds going towards repayment of Bank debt, and (2) the debtors were given the opportunity to successfully reorganize their farming operation. Although the debtors' unrefuted testimony was that the Bank consented in general to a recycling, the debtors did not present evidence to prove that the Bank caused, or consented or agreed to, specific expenses, and not all the expenses benefited both parties. For the reasons set forth in the footnotes, I find that the certain expenses were jointly beneficial to both the debtors and the creditor, while other expenses were primarily beneficial to only the debtors:

| ITEM | JOINTLY BENEFICIAL | PRIMARILY BENEFICIAL TO DEBTORS |
|------|--------------------|---------------------------------|
| **Labor** | | |
| Wages for Gail Goldsborough (hired man) 282 days @ $5.00 per hour/5 hours per day 1,410 hours.[3] | $ 7,050.00 | |
| Wages for Lloyd Kotter—282 days @ $9.00 per hour/2 hours per day 564 hours.[4] | | $ 5,076.00 |
| **Use of Facilities** | | |
| Fair rental value of confinement facilities @ $32,000 per year ($87.67 per day) 282 days @ $87.67 per day.[5] | | $24,722.94 |
| 50 acres of pasture of open lots for manure disposal and use of hogs @ $15.00 per acre.[6] | | $ 750.00 |
| Electricity (September, 1985) (Note: Bank paid electricity through August, 1985).[7] | $ 508.11 | |
| Machine hire: Pearson pump, honeywagon, endloader, tractor, mill for grinding feed 282 days @ $10 per day.[8] | | 2,810.00 |

3. A hired hand was necessary to tend the hogs.

4. Lloyd Kotter is one of the debtors. As compared to the hired hand, no wages were in fact paid to him. He is merely seeking the value of his time. Furthermore, living expenses were paid. So to permit him to actually receive living expenses plus receive the value of his time would permit him to obtain a double recovery.

5. The lease is for a ten year period and contains many provisions which give the lessee rights and obligations normally associated with ownership. As the lease payments permitted the debtors to keep the equipment over a long period of time as compared to the short period of time of the Bank's involvement and permitted the debtors to reorganize their farming operation and continue to use the equipment after the reorganization, the lease payments primarily benefited the debtors.

6. The pasture was owned by the debtors and any disposal of manure would involve part of the long range operations of the farm and would primarily benefit the debtors.

7. Without electricity the confinement facilities could not have operated. There was benefit received by both parties.

8. The machinery is similar to both the pasture and the confinement facilities. It was owned by the debtors and had a useful life far beyond the

| | | |
|---|---|---|
| Liability and fire insurance to cover hogs, buildings and machinery (Total $1,271.51/ bank's share—bank has second mortgage on real estate—70% est.) [9] | | $ 890.06 |
| Hog Feed | | |
| Corn: | | |
| Pre-petition corn subject to lien of FmHA 1,595.79 bu. @ $2.60 (average) | $ 4,149.05 | |
| Post-petition corn subject to lien of FmHA 5,695.91 bu. @ $2.60 (average).[10] | 14,809.37 | |
| Total | $26,516.53 | $34,259.00 |

However, the expenses of $26,516.53 which mutually benefited the parties must be adjusted to reflect that the debtors' requested expenses is based upon 282 days and this Court has found they were reasonable only for 216 days, and the expenses must be allocated to all 2,058 hogs which were processed and not just the 718 hogs which the Bank recovered. Adjusting the $26,516.53 to reflect expenses for 216 days results in expenses of $20,311.66 and allocating the amount to all 2,058 hogs results in an average expense of $9.87 per hog. For 718 hogs, the beneficial expense of $9.87 per hog, totals $7,086.66.

I, therefore, find that $7,086.66 is the total amount of the expenses that were reasonable, necessary and beneficial to the Bank, and hold that the debtors can recover from the Bank the sum of $7,086.66.

This decision is to serve as findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy procedure.

nine month period involving the Bank. This expense primarily benefited the debtors.

9. The debtors' attempt to charge the Bank with 70% of the insurance costs is based upon the fact that the Bank had 70% of the total collateral held by all creditors. Some of the Bank's collateral, i.e. a second mortgage on real estate, is so indirect it cannot be considered as directly affecting the herd. Debtors did not allocate the insurance cost to just the herd. The insurance expense is primarily for the debtors' benefit.

10. Without feed the hog herd could not have been recycled, and the number of hogs available to the Bank could not have been increased to 718. The proceeds of the other 1350 hogs which were processed by the debtors went solely to the debtors. Therefore, both the debtors and the Bank benefited.