**In re Bryan P. EARLEY and Sherrie L. Earley, Debtors.**

**Bankruptcy No. 86–80311.**

United States Bankruptcy Court, C.D. Illinois.

Oct. 8, 1986.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, Ill., for debtors.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for Commodity Credit Corp.

OPINION AND ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The Debtors are farmers and participated in the Commodity Credit Corporation's (CCC) Farm Price Support Program. Under this program, the CCC loans a farmer money at a pre-determined per bushel rate for corn the farmer grows. If the price of the corn rises above the loan rate,

the farmer may sell the corn on the open market, repay the loan and retain the balance of the sale proceeds. If the price remains below the loan rate, the farmer may deliver the corn to the CCC in satisfaction of the loan and thereby realize a profit that he otherwise would be unable to obtain through a sale on the open market. The Price Support Program constitutes a subsidy to the farmer and each transaction is cast in the nature of a secured loan transaction. The loan is evidenced by a Combined Farm Storage Note and Security Agreement which grants to the CCC a security interest in the corn and requires the farmer to store the corn until 60 days after maturity of the loan without additional cost to the CCC. Storage is in government approved storage facilities, which can be either "on farm" or "off farm". This procedure is commonly called "sealing" and the profit the farmer derives is commonly called the "sealing profit". The farmer also receives a "deficiency payment" to keep a portion of his acreage idle. The deficiency payment exceeds the profit that the farmer would obtain from planting those acres.

On December 12, 1985, the Debtors signed two combined Farm Storage Note and Security Agreements evidencing total loans of $15,789.60. These notes came due August 31, 1986. The Debtors' loans were based upon a loan rate of $2.58 per bushel for 6,120 bushels of corn. The open market rate for corn applicable to the transaction was in the area of $2.20 to $2.30 per bushel, resulting in a sealing profit to the Debtors of 28 cents to 38 cents per bushel.[1] The Debtors also received a deficiency payment of 48 cents per bushel for not farming the 10% "set aside" of their corn base. The Debtors stored corn both off farm and on farm. The off farm expense was at the rate of 24½ cents per bushel per year. The on farm expense was 2 cents per bushel per month, or 24 cents per bushel per year. The on farm expense was for the Debtors' rental of grain bins, electricity for aeration, inspections and for insurance.

On February 4, 1986, the Debtors filed their Chapter 11 proceeding. At some point in time thereafter, the Debtors requested that the CCC take the corn back. The CCC failed to do so, and on May 22, 1986, the Debtors filed a "reverse cash collateral motion"[2] which sought to have the court order the CCC to take the corn back and to reimburse the Debtors for the post-petition storage expenses. The motion relies on Section 554 of the Bankruptcy Code, which gives a debtor the right to abandon property that is burdensome to the estate, and Section 506(c) of the Bankruptcy Code which permits a debtor to recover from secured property reasonable and necessary expenses of preserving the property to the extent the secured creditor is benefited. The factual basis of the motion is that Debtors have no equity in the corn, it is not needed for their effective reorganization, and there is expense associated with keeping the corn in condition and avoiding spoilage.

On June 11, 1986, the CCC filed a response in which it agreed to reclaim the corn[3] but denied it was liable for any storage expense. Some time between that latter date and July 28, 1986, the CCC did pick up the corn. So there is no issue under Section 554 of the Bankruptcy Code for this Court to determine. However, as the CCC did oppose being charged with post-petition storage expenses, there is before this Court the issue of whether Section

---

1. These were the dollar amounts which the parties utilized at the time of the oral argument. The CCC's brief indicates the open market rate was $2.29 per bushel for a sealing profit of 29 cents per bushel.

2. The genesis for this terminology is that the corn is cash collateral under Section 363(a) of the Bankruptcy Code, and instead of the creditor demanding a return of the cash collateral, as is the usual case, the Debtors are demanding the creditor take back the cash collateral.

3. Although the CCC believes the Debtors are required to store the corn pursuant to the terms of the Program and the combined Note and Security Agreement, it did not contest the Debtors' request to return the corn.

506(c) imposes liability on the CCC for such expenses.

Section 506(c) provides as follows:

"(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." [4]

In order for the CCC to be charged with post-petition storage costs under Section 506(c), the Debtors must show (1) the costs were reasonable, (2) the costs were necessary, and (3) that the CCC benefited from such costs. *In the Matter of Trim-X*, 695 F.2d 296, (7th cir. 1982); *In re Lindsey*, 59 B.R. 168 (Bkrtcy.C.D.Ill.1986); [5] *In the Matter of Combined Crofts Corporation*, 54 B.R. 294 (Bkrtcy.1985). The CCC admits that the storage costs either on farm or off farm of 2 cents per bushel per month were reasonable. The CCC further admits the storage costs were necessary, because if the corn were left unstored it would spoil. But the CCC denies it received any benefit from the storage.

■ For the purposes of Section 506(c) the Debtors must show that the storage costs were expended primarily to benefit the CCC and directly benefited the CCC. Indirect, uncertain, or speculative benefits accruing to the CCC are not recoverable. Nor are incidental benefits. *In the Matter of Combined Crofts Corporation, supra.* However, the primary benefits associated with the storage and its related expense accrued to the Debtors, not the CCC. The storage was agreed to by the Debtors so they could participate in the Price Support Program. Had they not agreed, they would not have been able to obtain the sealing profit or the deficiency payment. If the price went up, the Debtors would have sold the corn, repaid the loan, and kept the balance of the sale proceeds. If the price remained below the price support

level, the Debtors' loan would have been repaid through the CCC recovering the corn at an artificially high price. The corn was placed in storage so the Debtors could have the best of two worlds. Receiving that benefit, the Debtors must assume the responsibility for the storage costs which permitted them to be placed in that position.

■ In support of their position, the Debtors make the following argument based on the government's election to structure the price support program as a secured non-recourse loan.[6] They begin by arguing that as the transaction involves a secured loan the CCC is subject to the provisions of Section 506(c) and no meaningful distinction should be made between the CCC and other secured creditors whose property is burdensome to the estate. They then go on to argue that they are entitled to be reimbursed for storage costs as the corn is useless to them, is not needed for an effective reorganization and is burdensome to them, and to reach a contrary result would be to obligate them to care for the government's corn without compensation. These arguments are based upon an inaccurate analysis of the nature of the Price Support Program. Initially, it should be recognized it is not the government's corn. Until the Debtors decide whether to sell the corn or return it to the CCC, it is the Debtors' corn, even though it is being held subject to certain restrictions. Furthermore, the corn is not being held without compensation. Debtors were paid an artificially high price for the corn, and received deficiency payments in exchange for storing the corn. To permit them to receive those payments and to require the CCC to pay for storage expenses would require the CCC to pay the storage expenses twice. Finally, there is a basis for drawing a meaningful distinction between the CCC and other secured creditors. The

---

4. The Debtors, being debtors in possession, have the same right under Section 506(c) as a trustee would have.

5. This Court's decision in another bankruptcy proceeding.

6. The Debtors recognize the transaction involves a government subsidy.

CCC entered into these loan transactions anticipating possible losses because of the subsidy nature of the Price Support Program. This Court knows of no other secured creditor who would purposely enter into a loan transaction with the idea it was possibly going to lose money.

In their brief the Debtors cite *In re Galle v. Farmers Home Administration*, No. 184–02389, a case decided by Chief Bankruptcy Judge Larry Lessen of the Central District of Illinois, and this Court's decisions in *In re Lindsey, supra*, and *In re Worrell*, 59 B.R. 172 (Bkrtcy.C.D.Ill., 1986). In the *Galle* case, Judge Lessen merely entered an order requiring the trustee to pay rent to the farmer from the proceeds of hog sales. There is no opinion which sets forth the facts in that case or the basis of Judge Lessen's order. From reading the CCC brief it would appear the hogs were kept on the farm so that they could be fattened and the best market price obtained for them. In *Lindsey* and *Worrell*, this Court was presented with a factual situation where the farmers had planted crops and before the crops could be harvested the farmers filed their bankruptcy proceeding, and the crops had to be maintained and harvested in order to bring them to their full value. These cases can be distinguished because in those cases costs had to be incurred in order for the creditor to avoid or minimize a loss. The creditor obviously received the benefit from those expenses. In the present case before this Court, as previously noted, the corn was merely being stored to give the Debtors an opportunity to decide how they could obtain the most value from the stored corn. Here, the benefits accrued to the Debtors and not to the creditor.

Nor can it be said that the CCC unreasonably delayed in reclaiming the corn. The Debtors filed their bankruptcy proceeding on February 4, 1986. At some point in time, which was not disclosed to this Court, the Debtors demanded the CCC take back the corn. The CCC initially refused to do so, and approximately 20 days after the Debtors filed their motion, the CCC agreed to take back the corn, which it did within no later than another 47 days. There was no evidence to indicate the CCC was dilatory or the delays were other than those normally associated with a bankruptcy proceeding.

For the reasons set forth above, the Debtors' Motion is DENIED.

This Opinion and Order is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.