In re DELTA TOWERS, LTD. d/b/a Ramada Hotel, New Orleans, La., A Limited Partnership, Debtor.

NEW ORLEANS PUBLIC SERVICE INC., Plaintiff,

v.

DELTA TOWERS, LTD., et al., Defendants.

Civ. A. No. 89–4089.
Bankruptcy No. 85–01081–B.
Adv. No. 87–0300.

United States District Court, E.D. Louisiana.

March 20, 1990.

Richard W. Bussoff, Gilbert Lee Hamberg, William Malcolm Stevenson, Monroe & Lemann, New Orleans, La., for New Orleans Public Service Inc.

Sidney A. Cotlar, Herman, Herman, Katz & Cotlar, New Orleans, La., for First Fed. Sav. & Loan.

Robert J. Burvant, Nesser, King & LeBlanc, New Orleans, La., for Borg–Warner Acceptance Corp. and David R. Vaughan.

Rudy J. Cerone, McGlinchey, Stafford, Mintz, Cellini & Lang, P.C., New Orleans, La., for David R. Burrus and Darryl D. Berger.

Tod M. Thedy, New Orleans, La., for Paul R. Valteau, Jr.

Philip Kirkpatrick Jones, Jr., Liskow & Lewis, New Orleans, La., for Delta Towers Ltd.

## MINUTE ENTRY

ARCENEAUX, District Judge.

Before the Court is the appeal of New Orleans Public Service Inc. ("NOPSI") from the bankruptcy court's order denying NOPSI's application for post-petition utility charges from the secured creditors of the debtor, Delta Towers, Ltd., ("debtor") under 11 U.S.C. § 506(c).

This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).[1] The bankruptcy court's findings of fact are accorded deference from this Court and will be overturned only if clearly erroneous. Bankruptcy Rule 8013. Questions of law are reviewed *de novo*. *In re Daniels Head & Associates*, 819 F.2d 914 (9th Cir.1987).

## BACKGROUND

The debtor is a limited partnership which has as its prime asset a multi-story building located at the corner of South Claiborne Avenue and Canal Street in New Orleans, Louisiana. From 1983 until August 1986, the debtor operated a hotel on this property. During this time, the debtor was a utility customer of NOPSI.

Defendants Darryl Berger and David R. Burrus ("Berger and Burrus") were the owners of the building in question until November 1981, when they conveyed it to the debtor. Berger and Burrus received promissory notes, secured by a mortgage on the hotel property and the movable property of the hotel, for part of the purchase price. In August 1982, First Federal of Warner Robins, Georgia ("First Federal") loaned money to the debtor to finance the acquisition and operation of the hotel which was secured by a collateral mortgage on the property. Borg–Warner Acceptance Corp. ("Borg–Warner") also loaned the debtor money to acquire equipment for the hotel and received a mortgage on the hotel property as well as a chattel mortgage on the equipment.

Debtor ultimately defaulted on all of these loans. On September 18, 1984, First Federal filed a Petition for Executory Pro-

---

1. 28 U.S.C. § 158 provides:

The district courts of the United States shall have jurisdiction to hear appeals final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title, An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

cess in state court to foreclose on its mortgage. Eventually all other secured creditors intervened to obtain ranking of their respective claims. On September 19, 1984 and September 9, 1985, the Civil Sheriff for Orleans Parish executed Writs of Seizure against the property. On May 14, 1985, the debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. The hotel ceased operating and was closed in November, 1988.

NOPSI provided utility service to the debtor for the hotel property from May 14, 1985 to July 31, 1986. On August 18, 1986, NOPSI filed an Application for Recovery of Administrative Expenses, Determination of Amount of Security Deposit Required and an Order Requiring Prompt Payment in Full for Utility Service ("Order Requiring Payment"). This Application asked for recognition of post-petition expenses as a priority administrative claim under 11 U.S.C. §§ 503 and 507. In addition, NOPSI asked for a security deposit of $150,000.00 as provided for by 11 U.S.C. § 366 ("§ 366") as adequate assurance of payment. By Order of the bankruptcy court on October 6, 1986, this Application was approved. NOPSI subsequently applied for recognition of further charges as priority administrative expenses. On November 4, 1987, the bankruptcy court supplemented its Order Requiring Payment and accorded NOPSI priority payment for service provided for the period from May 14, 1985 until July 31, 1986, after the bankruptcy petition was filed, in the amount of $406,131.51. Until the August 1986 application, NOPSI had taken no steps to obtain or secure payment for the utility services it provided.

This matter came before the bankruptcy court on a complaint filed by NOPSI on September 15, 1987. NOPSI sought recovery of not only fees for services provided post-petition, but also for pre-petition service provided from September 19, 1984 to May 13, 1985. It asserted three claims in its complaint. First, it sought to recover post-petition utility charges from the secured creditors of the debtor or from their collateral, under the authority of 11 U.S.C. § 506(c)[2] ("§ 506(c)"). These post-petition utility charges from May 14, 1985 to July 31, 1986 amounted to $406,131.51.

NOPSI also asserted that it was entitled to payment for both pre and post-petition service under an independent federal equity theory.[3] It argued that as a matter of equity, the preservation costs for the property in litigation, in this instance utility expenses, should be given priority over other liens.

Finally, NOPSI claimed it was entitled to payment for both pre and post-petition services under an independent state law claim. It argued that pursuant to Louisiana Code of Civil Procedure Articles 326–34 and 2371–81, it was entitled to the recovery of utility expenses from any sale of the property by the Civil Sheriff of Orleans Parish.

A trial was held on this matter on March 16, 1989 in the bankruptcy court. The bankruptcy judge limited the trial solely to evidence regarding whether the secured creditors and/or their collateral benefited from the utility service provided. The bankruptcy court, on July 20, 1989, issued its Findings of Fact, Conclusions of Law, and Order denying recovery under all three theories. That court denied relief under § 506(c) because NOPSI had not proven that its utility services had preserved the going concern value of the property. The court held that expenses producing indirect benefits are not recoverable under § 506(c) and the evidence submitted indicated only indirect, not direct, benefits to the collateral.

The court pointed out that § 366 specifically affords a utility company such as

---

**2.** This action was originally filed on June 4, 1987 as a Motion for Recovery of Post–Petition Utility Expenses in the bankruptcy proceeding of the debtor. It was changed, however, to an adversary proceeding by the filing of NOPSI's complaint. Originally, NOPSI included the debtor as a defendant. By Order of the bankruptcy court, dated October 30, 1987, however,

the debtor was dismissed without prejudice. (Doc. 22).

**3.** This figure included $406,131.51 in post-petition utility charges from May 14, 1985 to July 31, 1986 and $88,121.17 in pre-petition charges from September 19, 1984 to May 13, 1985.

NOPSI the opportunity to obtain adequate assurance of payment by way of a security deposit. Evidence presented to the court indicated that during the time the debtor was not paying its utility bills, NOPSI did not seek a security deposit from the debtor or the general partners of the debtor, did not contact the secured creditors for guarantees of payment and did not seek payment from the secured creditors at that time. Because NOPSI failed to take advantage of the opportunities available to it under § 366, the court would not now allow NOPSI to make up for these failures by recovering from the secured creditors without their consent or cooperation.

The bankruptcy court also denied recovery under a independent federal equity theory, the common fund theory, holding that this theory was not significantly distinguishable from the provisions of § 506(c). The court concluded that the equitable elements embodied in the common fund theory were codified by Congress in § 506(c). Since the court had previously determined that the utility expenses were not necessary for the preservation of the property involved in the litigation, NOPSI could not recover under the independent equity claim any more than it could under § 506(c).

Finally, the bankruptcy court abstained pursuant to 28 U.S.C. § 1334(c)(1)[4] from determining NOPSI's independent state law claim. The court noted that at the time of its judgment, an action was still pending in Louisiana state court concerning, *inter alia*, the ranking of the various liens on the debtor's property. It held that any matter related to the disposition of the proceeds from the potential sale of the property was highly dependant upon the results of the state court proceeding. Therefore, since the theory by which NOPSI sought relief was purely a matter of state law, the court abstained from deciding it in the interest of justice and comity.

## DISCUSSION

### 1. 11 U.S.C. § 506(c)

11 U.S.C. § 503(b)(1)(A) defines administrative expenses as including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case." These expenses are accorded priority of payment under 11 U.S.C. § 507(a).[5]

Generally, administrative expenses must be charged to the bankruptcy estate and not to equity or assets belonging to secured creditors. This is because the bankruptcy estate's trustee or debtor-in-possession acts for the interests of the general, and not the secured, creditors. *In re Trim–X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982); *In re Combined Crofts Corporation*, 54 B.R. 294, 297 (Bankr.W.D.Wis. 1985).

An exception to this rule, codified in § 506(c), provides that a secured creditor will be liable for such expenses if they were incurred to preserve or dispose of the property securing the creditor's interest and if the creditor benefited from the expenditure. Section 506(c) states: "[t]he [bankruptcy] trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." Courts interpreting this section have held that recovery is not limited to the trustee or debtor-in-possession, but extends to parties who incurred expenses preserving or benefiting the property. *In re Kotter*, 59 B.R. 266 (Bankr.C.

---

**4.** 28 U.S.C. 1334(c)(1) provides:

Nothing in this section prevents a district court in the interest of comity with State courts or respect from State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**5.** 11 U.S.C. § 507(a) reads, in pertinent part:
(a) The following expenses and claims have priority in the following order;
(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under Chapter 123 of title 28.

D.Ill.1986); *In re McKeesport,* 799 F.2d 91 (3d Cir.1986).[6]

In order for a secured creditor to be charged with expenses under § 506(c), a three-part test must be satisfied. It must be shown that (1) the expenditure was necessary, (2) the amounts expended were reasonable and (3) the creditor benefited from the expenses. *In re Trim–X,* 695 F.2d at 301; *In re Hospitality Ltd.,* 86 B.R. 59, 63 (Bankr.W.D.Pa.1988); *In re Cascade Hydraulics and Utility Service, Inc.,* 815 F.2d 546, 548 (9th Cir.1987); *In re Settles,* 75 B.R. 229 (Bankr.C.D.Ill.1987); *Crofts,* 54 B.R. at 294. The debtor bears the burden of proving by preponderance of the evidence that the expenses were reasonable, necessary and beneficial to the creditor. *Cascade,* 815 F.2d at 548; *Trim–X,* 695 F.2d at 301; *Hospitality Ltd.,* 86 B.R. at 63; *Crofts,* 54 B.R. at 294.

The parties stipulated in the bankruptcy court's Pre–Trial Order that NOPSI satisfied the reasonable and necessary tests of § 506(c). They stated that without gas and electrical services, the secured creditors' collateral would have deteriorated and adequate lighting and electricity was necessary to deter vandalism and theft. (Doc. 70, p. 19). Indeed, it appears that this stipulation was the motivation for the bankruptcy court's limiting trial to the issue of whether the secured creditors and/or their collateral received a benefit from the utility services. In addition, this Court notes that the utility services were vital to the hotel's operation because it could not have operated without the electricity and gas that these debts represent. In light of this stipulation and evidence taken at trial, the Court will consider these elements agreed to and review only the bankruptcy court's determination of benefit.

The bankruptcy court denied recovery under the benefit test of § 506(c) because it was of the opinion that the utilities provided only an indirect benefit to the secured creditors. While it is true that secured creditors cannot be taxed with the cost of speculative or indirect expenses, *In re Chicago Lutheran Hospital Association,* 75 B.R. 854 (Bankr.N.D.Ill.1987); *Crofts,* 54 B.R. at 297, this Court believes the bankruptcy court erred in this determination because the bankruptcy court's interpretation of benefit was too strict in light of analogous case law.

The Court in *In re Kotter,* 59 B.R. 266 (Bankr.C.D.Ill.1986), allowed recovery of utility expenses under § 506(c) because the hog confinement facilities operated by the debtor would not have been operable without electricity. Because the secured creditor had a security interest in the hogs, it benefited from the electricity services provided by the utility.

In *McKeesport, supra,* expenses for post-petition gas services were ordered paid to a utility company as an administrative expense. The court held that the utility services were necessary to preserve the going concern value of the debtor's estate and the secured creditors benefited because the firm sold for a higher price as an ongoing enterprise than it would have shuttered.

NOPSI's provision of utilities in this case benefited the secured creditors in two respects. First, the electricity and gas services preserved the hotel and the movables within it. NOPSI had provided the bankruptcy court with evidence that the hotel and its movables were subject to significant deterioration without utility services. An electrical engineering expert, Robert J. Alonzo, testified that without electricity the hotel would have deteriorated and its movables would have become infested with insects and rodents and ruined by mildew. (Doc. 107, p. 45). Mr. Alonzo also presented testimony regarding the effects of the failure to provide electricity and gas to a building such as the hotel in question. As the bankruptcy court noted "[t]his testimony revealed that there would be deteriora-

---

**6.** The bankruptcy court agreed with this in its Order stating, "[t]his Court agrees with this position, especially where, as in this case, the Debtor-in-Possession has declined to seek recovery. Further, the Court did in essence allow NOPSI, by the Order of May 19, 1988 approving amendment of the Complaint, to pursue this claim." (Order at 6).

tion." (Order at 4). Another witness, Bert Wallace, who had been involved in operating the hotel, testified that the building had physically deteriorated since it was closed and no utility services provided. (Doc. 107, p. 56–7).

The bankruptcy court gave no weight to this evidence, however, because "NOPSI offered no evidence to suggest that there was any utility service provided, during the period in question, when the hotel was not operating...." (Order at 4–5). In this context, this finding is clearly erroneous in light of *Kotter* and *McKeesport*. The fact that the hotel was not shuttered when the services were provided does not matter for purposes of determining if they provided a benefit. The facts are that service was provided and without it, the hotel would have deteriorated as it has since service was shut off. NOPSI's services kept the hotel from deteriorating and this is a benefit in and of itself to the secured creditors. The bankruptcy court's argument that NOPSI provided more service than required during this period since the amount of service required to operate the hotel was clearly greater than that required strictly for preservation, if proven, would only reduce the amount of payment to which NOPSI would be entitled, not preclude payment altogether.

The secured creditors also benefited, however, from NOPSI's services in that the electricity and gas provided helped maintain the going concern value of the hotel. In *In re AFCO Enterprises*, 35 B.R. 512, 515 (Bankr.D.Utah), the court stated that the "definition of benefit encompasses more than the bottom line of a balance sheet. Preservation of the going concern value of a business can constitute a benefit to the secured creditor." Federal and bankruptcy courts have allowed recovery of operating expenses such as utility charges under § 506(c) because they preserved the going concern value of a business. *See, McKeesport*, 799 F.2d at 94–95.; *In re Annett Ford, Inc.*, 64 B.R. 946 (Bankr.D.Neb.1986)

Based on the testimony of Robert J. Alonzo and Bert Wallace, NOPSI's utility services preserved the going concern value of the hotel so that it could be sold as an operating hotel as opposed to shuttered and subject to deterioration. *See, McKeesport*, 799 F.2d at 94–95.; *Annett Ford*, 64 B.R. at 947. Based on the foregoing case law, NOPSI has clearly met the third test of § 506(c) and so will be able to recover payment for these services from the secured creditors.

The bankruptcy court in part based its rejection of NOPSI's application for administrative expenses on the fact that NOPSI failed to take advantage of the protection available to it under § 366. Because it had failed to seek protection under this provision, the court held that NOPSI was estopped from seeking the costs of utility expenses an as administrative expense under § 506(c).

The bankruptcy court misanalyzed the interaction between these two provisions of the bankruptcy code. Section § 366 affords a utility company the opportunity to obtain adequate assurance of payment by way of a security deposit. Through this method the provider of utilities can obtain payment of post-petition utility expenses without waiting to be paid as an administrative expense.[7]

No authority exists, however, for the proposition that a utility is precluded from seeking relief under § 506(c) because it

7. 11 U.S.C. § 366 provides:
   (a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.
   (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

failed to invoke the provisions of § 366(b). Nothing in the bankruptcy code or legislative history suggests such a relationship and no cases have imposed one, under an estoppel or any other theory. To the contrary, §§ 506(c) and 366 appear to be totally independent of each other and bankruptcy courts have allowed utility companies to recover under § 506(c) without first following the procedures set forth in § 366. In *Kotter, supra,* the court allowed recovery of utility expenses under § 506(c) even though the utility had failed to seek relief under § 366(b).

The Court is aware that this ruling has harsh results. The secured creditors in this case did not know about the extension of credit and consequently did not consent to NOPSI supplying credit to the debtor. In holding that a utility provider is not precluded from seeking relief under § 506(c) because it failed to invoke the provisions of § 366(b), the Court does not condone the manner in which NOPSI handled this account. To the contrary, if NOPSI had availed itself of the protection of § 366 it could have guaranteed payment of post petition utility services from the debtor. As much as the Court disagrees with NOPSI·practices, no provision of the bankruptcy code prevents this court from granting NOPSI's claim under § 506(c) and the Court will not create one.

Because the Court finds a benefit for the secured creditors from the post-petition services, NOPSI's claims for payment for those services shall be charged to the secured creditors according to § 506(c). Since the bankruptcy court limited the trial it held to the issue of benefit to the secured creditors (Doc. 107, pp. 7 and 67), this Court will remand for a determination of the amount of administrative expenses to which NOPSI is entitled.

## 2. COMMON ·FUND THEORY

NOPSI seeks the recovery of the value of services, both pre and post-petition, under an independent federal equity theory. The common fund theory is an equitable principle associated with the preservation of property subject to litigation. The most frequently cited case for this proposition is *New York Dock Co. v. The Poznan,* 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927). In *Poznan,* the owner of a wharf claimed preferential payment of its unpaid wharfage charges furnished a vessel while in the custody of a U.S. marshal under a warrant of arrest in admiralty. The Supreme Court decided that fundamental equitable principles required prevailing parties to pay expenses that enhanced the value of the property or fund to which they were entitled. The Supreme Court concluded that:

> [t]he most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an 'expense of justice.'

*Id.* at 121, 47 S.Ct. at 484.

The Court stated that this principle is not limited to cases in admiralty, but instead rested "upon principles of general application which should govern whenever a court undertakes the administration of property or a fund brought into its custody for the benefit of suitors." *Id.* at 120, 47 S.Ct. at 484.

While the common fund theory has also been applied to bankruptcy cases, these cases involve the payment of attorneys' fees in unique factual circumstances. For example, NOPSI has cited *In re Triangle Chemicals, Inc.,* 697 F.2d 1280 (5th Cir. 1983) as evidence that independent equitable principles are not preempted in the bankruptcy setting. In *Triangle,* the attorney for a debtor-in-possession simultaneously filed a petition for reorganization and an application to continue operation of the business which alleged, *inter alia,* that the debtor would obtain the services of an attorney to represent it as debtor-in-possession. No court approval was obtained nor other formality complied with at the time because of the attorney's misunderstanding of the law. He acted as the debtor-in-possession's attorney for seven months.

According to the uncontroverted evidence, the attorney proved his services had

preserved some five to six hundred thousand dollars for the debtor's estate. The bankruptcy court, discovering that no order had been adopted appointing the attorney, noted that there must be a court order of appointment before an attorney can be compensated.

The Fifth Circuit Court of Appeals acknowledged that a bankruptcy court exercises powers of a court of equity and that equitable principles govern the exercise of its jurisdiction. In holding that equitable principles allowed the payment of the attorney's fees, the court did not intend to generally import the common fund equity principle in bankruptcy cases. Its holding was limited to the facts of the case. It stated:

> We only hold that, where through the oversight the attorney has neglected to obtain such prior approval but has continued to perform services for the debtor/debtor in possession ... the bankruptcy court retains equitable power in the exercise of its sound discretion, *under exceptional circumstances, ... to award compensation* for all or part of the services performed by such attorney that have subsequently benefited the debtor's estate and, consequently, its creditors.

*Id.* (emphasis added).

█ The *Triangle* case, by its own terms, does not compel this court to apply this theory to the facts of this case, nor should it. This case does not provide "exceptional circumstances" warranting application of this doctrine since, unlike *Triangle*, there are no mistakes or clearly inequitable situations involved here. In fact, quite the contrary. NOPSI provided services for which it now seeks payment. The bankruptcy code provides at least two methods by which NOPSI can obtain payment of post-petition services (§§ 366 and 506(c)) and the pre-petition services must be treated in the same manner as any other creditor claim. This court will not allow a creditor to make an end run around the bankruptcy scheme through the use of the common fund theory.

In fact, there is significant authority arguing that the common fund theory's eq-

uitable elements have been codified into the bankruptcy code and so does not exist independently of applicable code provisions. The bankruptcy court correctly denied recovery because this theory of recovery was not significantly distinguishable from the provisions of 11 U.S.C. § 506(c). It has been noted by one authoritative commentator on bankruptcy law that § 506 of the bankruptcy code codified preexisting equitable principles. That commentator states:

> Section 506(c) was intended by Congress as a codification of the long, but somewhat inconsistent, line of cases decided under (and in some instances, prior to) the 1898 Act expressing and applying the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the debtor, debtor in possession or trustee which are required to preserve or dispose of the property subject to lien to the extent the lienholder derives a benefit therefrom.

1 Collier on Bankruptcy, 506.06 (15th ed. 1990).

The legislative history behind § 506(c) which says that it "codifies current law," H.R.Rep. No. 595, 95th Cong., 1st Sess. 357 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, and allows for recovery of expenses from a secured party "[a]ny time the ... debtor in possession expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral...." 124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17411 (daily ed. Oct. 6, 1982). Whether or not the common fund theory is available in the bankruptcy context, it is certainly not appropriate to apply to the facts at hand.

3. STATE LAW CLAIM

█ NOPSI seeks the recovery of the value of services, both pre and post-petition, under an independent state law claim. It maintains that articles 326–334 and 2371–81 of the Louisiana Code of Civil Procedure impose an obligation on the sheriff of Orleans Parish to make sure all neces-

sary disbursements for the protection, preservation and administration of property under seizure are paid out of the proceeds of the sale of the property.[8] Since the electric and gas services it provided were necessary for the protection and preservation of the property, NOPSI argues it is entitled to payment for these services from the date of seizure until July 31, 1986.

The bankruptcy court abstained pursuant to 28 U.S.C. § 1334(c)(1) from determining this claim since, at the time of its judgment, an action was still pending in Louisiana state court concerning, *inter alia,* the ranking of the various liens on the debtor's property. Because NOPSI's claim was dependant upon the results of the state court proceeding, the bankruptcy court abstained from deciding the issue in the interest of justice and comity.

Since the bankruptcy court's determination, the state court has determined the issue of ranking,[9] but foreclosure proceedings are still pending and the final sale of the hotel property has yet to take place. Pursuant to La.Code of Civ.Pro. article 2373 (West 1990), NOPSI cannot assert its claim for preservation costs under Article 329 until the property has been finally disposed of in the state court proceedings. Article 2373 provides:

*Distribution of proceeds of sale*

After deducting the costs, the sheriff shall first pay the amount due the seizing creditor, then inferior security interests, mortgages, liens, and privileges on the property sold, and shall pay to the debtor whatever surplus may remain.

The clear language of the article contemplates that NOPSI cannot claim preservation costs until the judicial sale has occurred and that it must make such a claim in the state forum. *See, e.g., Cloud v. Maryland Casualty Co.,* 256 So.2d 830, 831–32 (La.App. 3d Cir.1972); *Pitre v. Tal-*

*ley,* 205 So.2d 818, 820 (La.App. 3d Cir. 1967). Because the sale has yet to occur, the state law claim is premature. The fact that NOPSI is no longer providing utility services does not change this result. Even though the terms of NOPSI's claim can be quantified, this article contemplates, and expediency dictates, that all costs and the payment of costs be decided at one time—after the sale of the property—and in one forum—that overseeing the foreclosure proceedings.

The Court recognizes that the sale of the hotel property is currently under the control of the state court handling the matters of ranking, foreclosure and sale. For this reason NOPSI's state law claim would be better decided by the state court overseeing the judicial sale. Pursuant to 28 U.S.C § 1334(c)(1)[10], this Court will affirm the bankruptcy court's abstention from deciding NOPSI's state law claim since that court, in supervising the foreclosure and sale of the property in question, should properly decide it. Accordingly,

IT IS ORDERED that the order of the bankruptcy court denying New Orleans Public Service Incorporated's application for administrative expenses is REVERSED. This matter is REMANDED to the bankruptcy court for a determination of the amount of administrative expenses to which New Orleans Public Service Incorporated is entitled under this opinion.

---

**8.** Louisiana Code of Civil Procedure, Article 329 provides: "The sheriff may make all necessary disbursements for the protection, preservation, and administration of property under seizure, which shall be taxed as costs of the seizure."

**9.** NOPSI wasn't a party to the state suit and the state court did not address its state law claim.

**10.** 28 U.S.C. § 1334(c)(1) provides:

Nothing in this section prevents a district court in the interest of comity with State courts or respect from State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.