**In re LUNAN FAMILY RESTAURANTS LIMITED PARTNERSHIP, an Illinois Limited Partnership, Debtor/Debtor-in Possession.**

**Bankruptcy No. 94 B 21227.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 30, 1996.

Thomas E. Raleigh, Brenda Porter Helms, Drew M. Dillworth, Raleigh Helms & Finke, Chicago, IL, for Debtor.

Richard Friedman, Office of the U.S. Trustee, Chicago, IL.

James D. Newbold, Assistant Attorney General, Revenue Litigation Div., Chicago, IL.

Mitchell E. Jones, Rooks Pitts & Poust, Chicago, IL.

Gina Krol, Cohen & Krol, Chicago, IL.

Gerald Sherman, Sonnenschein Nath & Rosenthal, Chicago, IL.

Schmidt & Salzman, Chicago, IL.

Michael Renner, Baldwin Renner & Clark, Wayne, PA, for Marriott Corp.

Jerome J. Kraisinger, Marriott Corporation, Washington, DC.

Thomas S. Kiriakos, Mayer Brown & Platt, Chicago, IL, for Bank of America Illinois.

Scott N. Schreiber, Maria F. DiLorenzo, Much Shelist Freed Denenberg & Ament, Chicago, IL, for Shoney's Inc.

Howard Adelman, Adelman Gettleman & Merens, Chicago, IL, for Michael Schulson.

John C. Tishler, Tuke Yopp & Sweeney, Nashville, TN.

Edward R. Gower, Chief Counsel, Illinois Dept. of Transportation, Chicago, IL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTORS § 506(C) MOTION

JACK B. SCHMETTERER, Bankruptcy Judge.

### Introduction

On October 25, 1994, Lunan Family Restaurants Limited Partnership (the "Debtor"), an Illinois limited partnership, filed for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Thereafter, the Debtor continued to operate its business as debtor-in-possession, selling off its interests in various restaurant properties from time to time with court approval. Debtor, together with Michael Schulson, a shareholder in Lunan Family Restaurants, Inc., which is Debtor's general partner, have moved for recovery of expenses and costs from secured collateral pursuant to 11 U.S.C. § 506(c) (the "Motion" by "Claimants"). Claimants seek to recover certain expenses incurred while operating Debtor's business after the bankruptcy petition filing date. Bank of America Illinois, (the "Bank"), is Debtor's largest and only secured creditor. It received large distributions out of sale proceeds. Claimants ask that those distributions be surcharged for obligations that Debtor incurred while preserving the Bank's collateral and enabling sales of restaurants to be made from an ongoing business rather than forced liquidation.

Trial on all issues was held. Having considered the evidence and arguments of counsel and the record of this bankruptcy proceeding, the following Findings of Fact and Conclusion of Law are made and entered.

### FINDINGS OF FACT

In the spring of 1991, the Debtor proposed a financing agreement to the Bank to convert 31 Chicago area "Wags" family style restaurants to "Shoney's" restaurant franchises. On September 30, 1991, the Debtor and the Bank entered into a loan and security agreement providing for extension of financial accommodations in the principal amount of $13.5 million dollars (the "LFR credit"). Proceeds of the LFR Credit were advanced over one year and nine months and were used to purchase restaurant locations and remodel and convert existing Wags restaurants. The Debtor either purchased restaurants, obtaining a fee simple absolute interest, or leased the premises from Marriott Family Restaurants ("Marriott").

In this bankruptcy proceeding, the Bank filed a proof of claim for $13,748,647.49. All but $30,000 of the Bank's claim has been allowed. The indebtedness from the LFR Credit was secured by a blanket lien on Debtor's assets. More specifically, the Bank received mortgages on the restaurants that were owned in fee simple absolute (the "Fee Properties"), and leasehold mortgages on the Debtor's interest in leases and subleases (collectively, the "Leases"). Other collateral included equipment located at each of the restaurants and accounts receivable. As additional security for the LFR Credit, Michael Schulson and Robert Blessing, shareholders in Lunan Family Restaurants, Inc., executed separate written Guarantees in favor of the Bank, each with a $3 million cap.

The "Shoney's concept" did not take hold in the Chicago area. By late summer 1993, the Debtor was in default under the LFR Credit and in default under numerous Leases with Marriott for failure to pay rent and accrued real estate taxes. Marriott threatened to terminate the Leases. On February 22, 1994, the Bank transferred the LFR Credit from its private banking division where the LFR Credit had initially been granted, to its "Special Assets Division," which handles troubled loans of the Bank. The members of the Special Assets Division of the Bank primarily involved in handling of the LFR Credit included Mr. Ronald Prince and Mr. James Coulter.

Mr. Prince acknowledged at trial on the § 506(c) issues that the Bank supported Debtor's selling of restaurants while Debtor was in default under the LFR Credit because that program was consistent with the Bank's belief that the best way to maximize the satisfaction of the Bank's debt was from liquidation of the Leases and Fee Properties on a going concern basis. The Bank did not seek to foreclose on the Leases or Fee Properties.

In October of 1994, the Debtor remained in default under the LFR Credit and the Leases. Marriott again threatened to terminate the Leases and take possession of the related restaurants. Marriott asserted that the Leases would be terminated on October 25, 1994, if taxes and rent were not paid. Notwithstanding ten months of defaults and threats of Lease terminations by Marriott, the Bank did not commence foreclosure actions with respect to Leases or Fee Properties. Instead, as Mr. Prince testified, officers of the Bank met in October of 1994 with representatives of the Debtor and discussed with Debtor the filing of a Chapter 11 petition. Shortly thereafter, on October 25, 1994 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and continued to operate its business and manage its property as a debtor-in-possession.

In this case, the Debtor filed Bankruptcy schedules showing the following:

Secured Indebtedness

| | |
|---|---|
| Bank of America–Illinois secured by a lien on substantially all the assets of the Debtor including but not limited to a mortgage on the Fee Properties; a leasehold mortgage on the Leases; and a security interest in the personal property of the Debtor. | $ 13,500,000.00 |

Priority Unsecured Claims

| | |
|---|---|
| Wages and Benefits (substantially paid during Chapter 11 case) | $ 211,260.00 |
| Health Insurance Claims | $ 113,000.00 |
| Tax Claims: | $ 135,965.00 |
| IL. Dept. Revenue Sales and Use | |
| IL. Dept. Emply. Sec. | $ 27,627.00 |
| IRS Payroll Tax | $ 24,225.00 |
| IRS Payroll and Unemployment Taxes | $ 220,166.00 |

Unsecured Claims

| | |
|---|---|
| Marriott Family Rest. | $ 527,255.78 |
| Shoney's Inc. | $ 1,759,655.20 |
| Other unsecured claims in excess of | $ 500,000.00 |

Trial Exhibit 34.

As noted, the Bank's claim has since been allowed for over $13.7 million. It is clear that, unless more than that amount is distributed to creditors, the only creditor to receive a distribution will be the Bank. At this point in the bankruptcy process, full payment of the Bank is most unlikely.

Through use of the Bank's cash collateral, Debtor operated its fee simple and leased restaurants through August 31, 1995, in accordance with budgets approved by the Bank and pursuant to Agreed Orders Authorizing and Restricting Use of Cash Collateral and Providing Adequate Protection, entered on November 2, 1994, and December 2, 1994, and extended from time to time thereafter (the "Cash Collateral Order"). The Cash Collateral Order expressly provides that the Bank was not consenting to imposition of any 11 U.S.C. § 506(c) surcharges against its collateral, but did not contain any express or implied waiver by Debtor of any right to recover costs and expenses from the Bank. On February 22, 1995, the Debtor filed its plan of liquidation which provided for sale of the Leases and Fee Properties on a going concern basis. The Debtor operated its busi-

ness pursuant to cash collateral orders and budgets approved by the Bank from the Petition Date through November 15, 1995.

As of the Petition Date, the Debtor maintained Leases and Fee Properties through operation of Shoney's restaurants in the Chicago metropolitan area. Eleven of those restaurants were owned in fee simple absolute and twelve of the locations were either leased or subleased by the Debtor as lessee/sublessee from Marriott. One of the restaurants was leased from Elm Gurnee Limited Partnership.

The Debtor presented alternative Chapter 11 plans to the Bank for consideration, but the Bank rejected any plans that involved a long term payout. The Bank has not presented its own plan and has not suggested on this record any modifications to Debtor's proposals.

On January 18, 1995, the Debtor obtained entry of an order authorizing employment of Site Location Specialists to continue its efforts begun pre-bankruptcy to market the Leases and Fee Properties for sale while business operations continued. Within five months of the Petition Date, eight Leases and Fee Properties were sold on a going concern basis. One other Lease was rejected and business operations at two of the other premises were closed. Within ten months from the petition date, the Debtor was able to sell a total of nineteen leased and fee restaurants, and it no longer operates at three premises. The Debtor is also actively marketing its remaining Leases and Fee Properties for sale, except for the lease of the restaurant known as Elm–Gurnee, which was rejected.

The Bank has not tried to convert this case to a Chapter 7 proceeding and has consented six separate times to use of cash collateral. The Bank also supported the extension of the Debtor's exclusivity period pursuant to 11 U.S.C. § 1121 to allow the Debtor more time to operate and liquidate the Leases and Fee Properties on a going concern basis.

The sale of nineteen Leases and Fee Properties generated over $11 million in gross proceeds, including $1,771,606.69 from sale of Leases, from which the Bank has received over $8.2 million in payments. In receiving such payments, the Bank remained subject to the possibility of § 506(c) surcharge, although it never agreed thereto.

In the course of Debtor's operations, the Debtor has incurred the following costs and expenses which have not been paid from sales proceeds of the Leases and Fee Properties and which the Debtor lacks funds to pay:

### TABLE 1

#### Table of Expenses

| | | |
|---|---|---|
| (a) | Payroll withholding (federal taxes) for the period April 1, 1995 through June 30, 1995 (including penalty and interest of $29,518.83) | $203,642.83 |
| (b) | Payroll withholding (states taxes) for the period of April 1, 1995 through June 30, 1995 | $ 19,288.74 |
| (c) | Federal unemployment tax for the period January 1, 1995 through March 31, 1995 | $ 9,135.52 |
| (d) | Utilities charges | $ 5,926.85 |
| (e) | Rent charges | $ 64,972.67 |
| (f) | Health insurance claims of employees after the Petition Date | $101,051.00 |
| (g) | State unemployment tax for the period April 1, 1995 through June 30, 1995 | $ 15,680.07 |
| (h) | Federal unemployment tax for the period April 1, 1995 through June 30, 1995 | $ 4,484.68 |
| (i) | State unemployment tax for the period June 30, 1995 through September 30, 1995 | $ 4,451.94 |
| (j) | Federal unemployment tax for the period June 30, 1995 through September 30, 1995 | $ 1,132.31 |
| (k) | Crowe Chizek—tax services performed in connection with the preparation of the 1194 Federal and State partnership returns | $ 6,925.00 |
| (l) | "Other DIP Payables" | $ 15,000.00 |
| | TOTAL | $451,691.55 |

The obligations listed above do not include anything for purchase of new restaurants or to make capital improvements to existing

premises. The Debtor asks that it be reimbursed for all the foregoing expenses through a surcharge on the Bank's distribution from this estate, under § 506(c).

During the post-petition period, the Debtor operated restaurants as going concerns. During such period, and in connection with such operations, the Debtor incurred and paid liabilities totaling $8,625,328.90 to post-petition creditors, consisting of $2,654,746.01 to suppliers, $2,441,958.90 in net payroll to employees, $1,519,632.59 in sales taxes, $953,-964.33 in utilities and insurance (including payroll taxes), $695,959.00 in rent, and $359,-077.81 in other expenses.

The Debtor has disposed of its fee simple and lease interests in twenty of the fee simple and leased restaurants for gross sale proceeds totaling $11,507,500.00, which included $1,771,606.69 from sale of the Leases. Of the total received, $8,223,00.25 was distributed to the Bank and applied by it against its pre-petition secured claim. The remaining $3,284,495.75 was paid to other creditors and parties in interest consisting of $1,432,459.35 in real estate taxes, $1,017,-261.07 in rent and payment of other liens, $89,790.20 in utilities, $173,739.46 in attorney's fees, $533,516.24 in broker's commissions, and $37,729.43 in other expenses. Of $20,132,829.90 paid to creditors and parties in interest during the pendency of this Chapter 11 case, acquired from both business operations and the foregoing restaurant sales, $11,909,824.65 was paid to post-petition suppliers, lessors, taxing authorities, utilities, brokers, and other creditors and parties in interest, while the balance of $8,223,004.25 was paid to the Bank for application against its pre-petition claim.

Fact statements and findings of fact set forth in the Conclusions of Law will stand as additional Findings of Fact.

### CONCLUSIONS OF LAW

Jurisdiction lies under 28 U.S.C. § 1334(b), and this matter is a core proceeding under 28 U.S.C. § 157(b)(2).

■ Costs of administering a bankruptcy estate must generally be borne by the estate and its general creditors, and such expenses will not ordinarily be charged against collateral of secured creditors. *Matter of Trim–X, Inc.*, 695 F.2d 296 (7th Cir. 1982). Section 506(c) of the Bankruptcy Code, Title 11 U.S.C., sets forth a limited exception to this general rule to be applied to expenses incurred primarily for benefit of the secured creditor. *Id.* at 301.

■ Section 506(c) provides that "[t]he trustee may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." A three-part test must be satisfied for expenses to be charged against a secured creditor's collateral. It must be shown that (1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure. *Matter of Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982). The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that these elements are satisfied. *In re Flagstaff,* 739 F.2d 73, 77 (2d Cir.1984); and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers, Ltd.),* 112 B.R. 811, 815 (E.D.La.1990). Section 506(c) is based in equity and is the proper vehicle for making the Bank pay for benefit it reaped, if the requirements are met. *See Precision Steel Shearing, Inc. v. Fremont Financial Corporation (In re Visual Industries),* 57 F.3d 321, 324 (3d Cir.1995) (section 506(c) is based in equity); *United States v. Boatmen's First National Bank of Kansas City,* 5 F.3d 1157, 1158 (8th Cir.1993) ("[section 506(c) ] is equitable in origin, preventing a windfall to a secured creditor at the expense of the trustee or debtor in possession").

■ Although § 506(c) refers to the "trustee" as claimant, the courts have interpreted it to allow such recovery to the debtor-in-possession and to parties who actually incurred the expenses of preserving or benefiting the property. *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Company)* 799 F.2d 91 (3d Cir. 1986); *Kotter v. First State Bank of Beardstown (In re Kotter),* 59 B.R. 266 (Bankr. C.D.Ill.1986). Thus, the Debtor and its gen-

eral partner are proper parties to bring the instant claim against the Bank, and they must establish by a preponderance of the evidence that the expenses they incurred were reasonable and necessary to preserve or dispose of the restaurants, and that the benefit of those expenses accrued primarily to the Bank.

Here the evidence established that most of the expenses asserted were necessary to preserve and recover the highest possible market value of the Bank's interest in the Leases and Fee Properties, were reasonable and provided a quantifiable actual benefit that accrued primarily to the Bank. However, Debtor rejected the lease on the restaurant located in Gurnee, Illinois. Consequently, that lease was not sold. For reasons stated below, the Bank is not surcharged for expenses incurred while Debtor was operating this restaurant. Likewise, expenses related to Debtor's offices did not directly benefit the Bank, nor did accounting fees or miscellaneous expenses, or other expenses not surcharged as detailed below.

### Amounts Are Reasonable

Evidence submitted at trial established that all of the asserted charges were incurred in the course of Debtor's restaurant operations: the taxes were determined in accordance with applicable tax law; the health benefits were determined in accordance with agreements of the respective employees and consistent with employees benefits law; the utility expenses were determined in accordance with the rate schedules normally charged by the respective utilities in their business operations; the rent was determined in accordance with the existing lease agreements and market conditions; the tax return preparation expenses were incurred in amounts consistent with industry standards; and collection expenses constitute estimates of costs incurred by the respective parties. All expenses that Claimants ask the Bank be surcharged were reasonable and necessary.

### Primary Benefit

■ The utilities and wage-related expenses for the Fee Properties and leased restaurants which were sold produced an actual quantifiable benefit incurred primarily for benefit of the Bank. The requirement of a benefit to the secured creditor is the most important factor in applying § 506(c). *In re Chicago Lutheran Hospital Association,* 89 B.R. 719, 730 (Bankr.N.D.Ill.1988) (Ginsberg, J.). Such a benefit must be shown in a quantitative rather than qualitative sense, and the expense must have been incurred primarily for the benefit of the secured creditor. *Id.* These standards are satisfied in the instant case. Most expenses submitted by Claimants directly and primarily benefited the Bank.

■ Costs expended while keeping the Debtor running as a going concern may be charged to the secured creditor where maintaining the going-concern value actually and specifically benefited the secured creditor. *United States v. Boatmen's First National Bank of Kansas City,* 5 F.3d 1157, 1160 (8th Cir.1993); *In re AFCO Enterprises,* 35 B.R. 512, 515 (Bankr.D.Utah 1983) (preservation of going concern value of a business can, under some circumstances, constitute benefit to secured creditor).

The Bank certainly received benefit of the increased price obtained from sale of the Fee Properties, and also from $1,771,606.69 it received through sale of leases by the Debtor. On the eve of bankruptcy, the Bank itself valued the leases as worth little to it, if anything, because there were no funds to cure delinquencies thereunder, and it valued the other restaurants ("Fee Properties") at much less than they were ultimately sold for. Had most of the asserted expenses not been paid or incurred by the Debtor, all the restaurants would have shut down and the Bank would have received nothing on the leases and a much lower price on sale of the Fee Properties.

The leases were certainly valueless unless someone put up the funds needed to cure obligations thereunder. Debtor's operations post-petition paid $495,000 to do just that. This was bread cast upon the waters which came back in the end as $1,771,606.69 to the Bank's benefit from sale of the leases alone. The Bank thereby received direct benefit

from the funds paid from ongoing operations to satisfy rent owed to Marriott and to pay other lease and operating expenses. Its benefit came from the $1,771,606.69 received by it from sale of leases, an amount it would not have received had those restaurants not been kept open.

The evidence also demonstrated that the Bank benefited by the Fee Properties being kept operational after the bankruptcy filing. Sales of the Fee Properties were expedited and the sale prices greatly enhanced by keeping the restaurants in operation. It is clear that much of the $6,415,400 produced from sale of fee simple restaurants was the result of good marketing, which only was possible because the lights were on and employees were working to keep the restaurants functioning.

Mr. Melaniphy, who was hired by Debtor to facilitate sale of the restaurants, convincingly testified to the significant price difference between a restaurant sold in operating condition, "lights on", and a restaurant that is sold while closed. Mr. Melaniphy testified that selling restaurant properties in a "lights on" condition allows prospective purchasers to witness the operation of a restaurant, inspect the quality of the equipment under working conditions, and analyze the patrons in terms of number and demographics. Closed restaurants do not allow prospective purchasers the opportunity to assess these conditions, which generally lowers their bids in the face of greater uncertainties. Closed restaurants are generally perceived to be available at "fire sale" prices and the owners to be in dire need of funds. Claimants proved that they were able to obtain higher prices for all the sold restaurants because they were sold as going concerns.

After Debtor filed for bankruptcy, the Bank had two general courses of action to choose: either foreclose or allow Debtor to keep the restaurants going to derive the benefit ultimately achieved. If it foreclosed, the Bank would have been faced with foreclosing costs and most of the operating costs involved here if it then sought to realize going concern value. Here the Bank saved all these costs and was directly benefited because Debtor incurred most charges claimed here by keeping the restaurants open.

Despite this history, the Bank contends it was not the party that received primary benefit of the asserted expenses, since it says Mr. Schulson (Debtor's general partner) was also benefited by payments that the Bank received from sales of restaurants because he personally guaranteed the LFR Credit. However, his guarantee had a $3 million cap. It now appears that the balance due the Bank after all payments to it are received will leave his guarantee fully outstanding. As of conclusion of the hearing, only $8,223,-004.25 had been distributed to apply on the Bank's allowed claim of $13,718,647.49, leaving a balance due the Bank of $5,495,643.24. His degree of benefit will therefore be nil. Even if Mr. Schulson is ultimately benefited marginally by selling of the restaurants as going concerns, the Bank obviously received the primary benefit of such sales and the related expenses.

■ In this bankruptcy proceeding, the Bank will be the only party, other than administrative creditors, that will receive distribution from the bankruptcy estate. A finding that an expense was made "primarily for the creditor's benefit" is a specific inquiry. *PSI, Inc. of Missouri v. Aguillard (In re Senior–G & A Operating Co., Inc.)*, 957 F.2d 1290 (5th Cir.1992). Where estate distribution is made only to one secured creditor in bankruptcy, the increased priced realized from selling the debtor as a going concern directly benefits that creditor. *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Company)*, 799 F.2d 91, 94 (3d Cir.1986).

### Necessary "Preservation" Expenses

■ Necessary costs are those which are unavoidably incurred in the preservation or disposal of the secured property. *In re Chicago Lutheran Hospital Ass'n.*, 89 B.R. 719, 727–28 (Bankr.N.D.Ill.1988). Here the utilities, wage-related taxes and withholdings, and health insurance claims incurred were necessary for the disposition of all fee simple and leased restaurants that were sold. See Table 1, A–D, F–J.

Courts have held that each of these items can be properly surcharged to the creditor's collateral pursuant to 11 U.S.C. § 506(c): withholding/unemployment taxes—*United States v. Boatmen's First National Bank of Kansas City*, 5 F.3d 1157 (8th Cir.1993) (employee withholding taxes incurred in operation of debtor's business pending sale of the bank's collateral are properly surcharged); employee benefits/health benefits—*In re Phoenix Pipe Line and Tube L.P.*, 174 B.R. 688 (E.D.Pa.1994) (employee benefits incurred in keeping business operating pending sale or surcharge); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382 (E.D.Pa.1991) (employee wages can be § 506(c) expenses); utility charges—*In re McKeesport Steel Castings Company*, 799 F.2d 91 (3d Cir.1986) (utility charges incurred in keeping business operating pending sale were surcharged).

In its pleadings and at trial the Bank has not argued that expenses for utilities were not necessary for preserving or disposing of the restaurants. It does argue that wage-related expenses such as payroll taxes and withholdings and health insurance claims are not proper § 506(c) expenses since, unlike utilities, they are not necessary to preserve the physical collateral such as the building and equipment. Utilities, the Bank argues, should be the only expense considered for allowance here since they are more like what Congress intended § 506(c) surcharges to be, viewed as directly necessary in maintaining or preserving the collateral.

In this case, distinguishing between labor costs and utilities is unrealistic. The leased restaurants could not have been sold without the employees that kept working during the bankruptcy process. Workers were needed as much as utilities, and their employment directly benefited the Bank. The expenses of hiring workers include their payroll, related payroll taxes, and their health insurance benefits. The Debtor could not have kept the workers employed without such expenses and obligations. The taxes resulting from the payroll, including withholding and unemployment taxes, both state and federal, were directly related to the necessity of having employees working, as did health insurance claims. It is unrealistic to argue that, while

gas, electricity, and water used in the interim period might be § 506(c) expenses, costs associated with employment are not. Without people on the job, there would have been no benefit to the Bank; and without the Debtor undertaking the obligations involved in this discussion, they would not have been on the job.

Without the utilities, withholding and unemployment federal and state taxes, and health insurance claims filed by the employees being paid or incurred by the Debtor (Table of Expenses above, subsections a through d, f through j), the restaurants could not have continued operating. Such expenses are properly surcharged under § 506(c).

### *Expenses Not Allowed*

 Claimants have also asked for § 506(c) treatment of other obligations that Debtor incurred in the ordinary course of operating the restaurants. Among those are obligations to its accountant for partnership tax services and for unspecified "Other DIP Payables." *See* subsections k and l of Table of Expenses. Unlike utilities and employment expenses, however, these obligations were not shown to be directly related to benefit received by the Bank. Claimants have not demonstrated a direct and immediate relationship between the $15,000 requested for "Other DIP Payables" and benefit to the Bank. Nor did the Bank receive a direct benefit from tax services afforded to Debtor, since this expense is incidental to any bankruptcy estate. Even though such expenses may have been a natural consequence of running the business, that does not mean that incurring them gave a direct and quantifiable benefit to the Bank.

Rent for the general office was included in subsection m of the Table of Expenses titled "Other DIP Payables." Claimants did not demonstrate that rent charges for Debtor's general office were necessary to keep the restaurants operating.

For failure to meet the required standards, the Bank is not to be surcharged for these and other miscellaneous expenses not allowed. (*See* Table 2 below, Col. 2).

Expenses required to keep the Gurnee property operating are also not allowed under § 506(c). Claimants argue that, even though the Gurnee lease was not sold, the Bank was still benefited by $2,000 per week in net cash flow from the Gurnee restaurant. These funds were allegedly used to pay expenses incurred at other restaurants that were sold. While there was some general testimony that excess cash in that amount was diverted regularly to other restaurants that were not as profitable as Gurnee, no accounting evidence was submitted to identify and specify any such cash flow as excess over expenses, or that such cash flow was used to pay particular expenses of direct benefit to the Bank. On this record, Claimants have not established by a preponderance of the evidence that excess cash flow from Gurnee was diverted in some specific amounts to other restaurants to pay for expenses of a nature otherwise here allowed under § 506(c). Since the Gurnee property was not sold for benefit of the Bank, Claimants are not to be reimbursed for any expenses incurred for it (See Table 2 below, Col. 3).

In sum, the following expenses are allowed and disallowed for reasons earlier discussed:[1]

## Table 2

| Category of Expenses as Set Forth on Debtor's Exhibit | 1 Total Amount of Claimed § 506(c) Expense | 2 Rejection by the Court of § 506(c) Expenses by Category | 3 Rejection by the Court of § 506(c) Expenses Allocated to Gurnee |
|---|---|---|---|
| Federal Payroll Taxes for 2nd qtr 1995 | $174,123.74 | $ 0.00 | $31,073.66 |
| Penalty and Interest on Above | 29,518.83 | 0.00 | 5,267.85 |
| State Payroll Taxes for 2nd Qtr 1995 | 19,288.74 | 0.00 | 3,713.87 |
| Federal Unemployment Taxes for 1st Qtr. 1995 | 9,135.52 | 0.00 | 786.01 |
| Federal Unemployment Taxes for 2nd Qtr. 1995 | 4,484.68 | 0.00 | 894.26 |
| Federal Unemployment Taxes for 3rd Qtr. 1995 | 1,132.31 | 0.00 | 655.88 |
| State Unemployment Taxes for 2nd Qtr. 1995 | 15,680.07 | 0.00 | 3,058.73 |
| State Unemployment Taxes for 3rd Qtr. 1995 | 4,451.94 | 0.00 | 2,468.29 |
| Post Petition Health Insurance Claims | 101,051.20 | 0.00 | 64.00 |
| Utility Charges | 5,926.85 | 0.00 | 0.00 |
| Rent Charges—Elm Gurnee and Inn of O'Hare | 64,972.67 | 64,972.67 | 0.00 |
| Crowe Chizek Tax Preparation | 6,925.00 | 6,925.00 | 0.00 |
| Other DIP Payables | 15,000.00 | 15,000.00 | 0.00 |
| TOTALS | $451,691.55 | $86,897.67 | $47,982.55 |

### Lack of Consent

The only exception to the requirement of a direct benefit applies when the secured creditor consents to or directly causes the costs to be incurred. Where the

1. The parties stipulated to the calculations in column 3 after the Court's ruling was announced from the bench.

secured creditor expressly or by its actions consents to services and payment for those services out of collateral, it cannot avoid making such payment on the grounds that it received no actual benefit. *Chicago Lutheran,* 89 B.R. at 730. Such consent will not be easily implied in the absence of express consent. *Id.* In this case, clearly there was no express consent. Claimants argue, however, that the Bank impliedly consented to the expenditures when it approved the Cash Collateral Order, and failed to move for dismissal, conversion or a modification of the automatic stay to allow foreclosure. This argument is faulty as a matter of law, and also contrary to the evidence.

█ It is well-settled that creditor cooperation in the reorganization effort, including support for a cash collateral order, is not the same as consent to finance the costs of the reorganization case, *id.* at 730, and that failure to move for a modification of the automatic stay or for adequate protection does not constitute consent to § 506(c) charges. *In re Delta Towers, Ltd.,* 112 B.R. 811 (E.D.La.1990); *In re New England Carpet Company,* 28 B.R. 766 (Bankr.D.Vt.1983). The policy underlying this rule is evident, since charging secured lenders with such costs merely because they did not close down the debtor would discourage creditors from providing financing and would be contrary to purposes of Chapter 11. *Chicago Lutheran,* 89 B.R. at 730.

Here, the Debtor operated the restaurants in accordance with budgets approved by the Bank pursuant to the original consented Cash Collateral Order which was extended from time to time thereafter by agreement. The Cash Collateral Order expressly provided that the Bank was not consenting to imposition of any 11 U.S.C. § 506(c) surcharges against its distribution. Indeed, the Bank expressly conditioned its approval of the Cash Collateral Order on the fact that its approval of the Order was not to be construed as consent to § 506(c) charges. Thus, the Bank's actions in agreeing to that Order and its continued effectiveness could not and did not here constitute implied consent to § 506(c) payment of any expenses. Under all the circumstances established here by evidence, it is found that the Bank clearly did not consent thereto either expressly or impliedly.

## CONCLUSION

Claimants proved by a preponderance of evidence that the utilities, payroll, withholding and unemployment taxes, and health insurance claims that the Debtor paid or incurred in order to keep the restaurants operating until their sale were reasonable and necessary expenses and were expended for primary benefit of the Bank. However, other claimed surcharges for expenses are disallowed.

The following table summarizes the allowed and disallowed claims and the final calculation of § 506(c) allowance:

### Table 3

| Calculation of expenses disallowed by the Court under § 506(c) | |
| --- | --- |
| Categorical Expenses Rejected by the Court | $ 86,897.67 |
| Portion of other Expenses Allocated to Elm–Gurnee Store and disallowed | $ 47,982.55 |
| **Total § 506(c) Expenses Disallowed** | **$ 134,880.22** |

| Calculation of Net § 506(c) Expenses Allowed by the Court | |
| --- | --- |
| Total Expenses Sought by the Debtor under § 506(c) | $ 451,691.55 |
| Less Total Expenses Disallowed | $(134,880.22) |
| **Total Net § 506(c) Expenses Allowed** | **$ 316,811.33** |

The Bank's distribution from sale of the fee simple restaurants and leased restaurants is to be surcharged in the amount of $316,811.33. An order and judgment effectuating this ruling is separately entered this date.